**UNITED STATES of America, Plaintiff,**

v.

**Russell D. FAIRCHILD, Defendant.**

No. 96–00058–01–CR–W–2.

United States District Court,
W.D. Missouri,
Western Division.

Oct. 10, 1996.

D. Michael Green, United States Attorney's Office, Kansas City, MO, for plaintiff.

Brian Gepford, Kansas City, MO, for defendant.

### ORDER

GAITAN, District Judge.

Before this Court is defendant Russell D. Fairchild's motion to suppress statements, filed May 24, 1996.

On August 28, 1996, Magistrate Judge Robert E. Larsen entered a report and recommendation addressing defendant's motion to suppress statements. That report recommended the denial of the motion. No objections were filed to the report and recommendation.

The Court, after independent review of the record and applicable law, adopts and incorporates by reference herein, the magistrate's findings and conclusions in the report and recommendation. Therefore, the Court finds that defendant's motion to suppress statements must be denied.

Accordingly, it is

ORDERED that the magistrate's proposed findings and conclusions are hereby adopted and incorporated herein by reference. It is further

ORDERED that the defendant's motion to suppress statements, filed May 24, 1996, is denied.

## REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

LARSEN, United States Magistrate Judge.

Before the court is defendant's motion to suppress statements made by defendant while in his residence, while being transported to the police station, and while at the police station on the ground that he was questioned while in custody and without having been advised of his *Miranda* rights. I find that (1) the statement made following Detective Seever's question about the ownership of the house and whether any heat sources were operating falls within the public safety exception to the *Miranda* requirement, (2) defendant's comments about going to Corpus Christi and dumping the chemicals were statements volunteered by defendant, (3) defendant's statement in response to Detective Seever's question regarding the identity of the chemical Seever stepped in falls within the public safety exception to the *Miranda* requirement, and (4) defendant's statement given at the police station was voluntarily made after knowingly and voluntarily waiving his *Miranda* rights and was not a fruit of an earlier unlawful admission. Therefore, defendant's motion should be denied.

### I. BACKGROUND

On May 2, 1996, a three-count indictment was returned charging defendant with one count of attempting to manufacture methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), and two counts of possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).

On May 24, 1996, defendant filed a motion to suppress statements (document number 28). In support of his motion, defendant argues that he was in custody and was questioned without having been advised of his *Miranda* rights on two occasions, and that his statement made at the police station was the product of the earlier unlawful admissions.

On June 14, 1996, the government filed a response in opposition to defendant's motion (document number 40) arguing that the statements made by defendant at his residence fall within the public safety exception to the *Miranda* requirement, the statements about leaving for Corpus Christi were not the result of express questioning or its functional equivalent, the statements made after being asked the identity of the chemical Detective Seever had stepped in falls within the public safety exception, and the statements made at the police station were voluntarily made after a knowing and voluntary waiver of his *Miranda* rights. A hearing was held on June 24, 1996, on this motion and defendant's motion to suppress evidence. Defendant was present, represented by Brian Gepford. The government was represented by Assistant United States Attorney Michael Green. The government called Detective Jeffrey Seever of the Independence, Missouri, Police Department and assigned to the Jackson County Drug Task Force, as a witness. The defendant called John Lawson, a private investigator, as a witness. The following exhibits were admitted:

P.Ex. 1–A Certified copy of affidavit and application for search warrant for 2440 S. Norwood, Independence, Missouri dated March 9, 1996;

P.Ex. 1–B Certified copy of search warrant dated March 9, 1996;

P.Ex. 1–C Certified copy of search warrant return made on March 18, 1996;

P.Ex. 2–B Picture of basement window adjacent to front porch at 2440 S. Norwood;

P.Ex. 2–C Picture of front of house at 2440 S. Norwood showing basement window in relation to front porch—the arrow indicates where the window is and the "X" indicates where Detective Seever was standing when he looked through the window;

P.Ex. 2–D Photograph of kitchen table containing a fish bowl and a glass jar with white substance inside;

P.Ex. 2–G Photograph of breakfast bar with glassware containing white residue;

P.Ex. 2–H Photograph of the side of defendant's residence;

P.Ex. 2–I Photograph of the rear of defendant's residence;

P.Ex. 3–A *Miranda* rights form with defendant's response handwritten by Detective Seever;

P.Ex. 3–B Interview questions and answers written by Detective Seever and signed by defendant;

P.Ex. 4 Drawing of floor plan of defendant's residence made by Detective Seever during evidentiary hearing—green circle indicates window Seever looked through from front lawn;

D.Ex. 1 Photograph of basement window adjacent to front porch at 2440 S. Norwood;

D.Ex. 2 Photograph of basement window adjacent to front porch at 2440 S. Norwood;

D.Ex. 3 Photograph of basement window adjacent to front porch at 2440 S. Norwood; and

D.Ex. 4 Photograph of front of defendant's residence, "X" indicating where Detective Seever was standing when he smelled the chemical odor.

## II. FINDINGS OF FACT

Based on the evidence presented at the hearing, I submit the following findings of fact:

1. In the early morning hours of March 9, 1996, the Independence, Missouri, Police Department received a complaint of a strong chemical odor coming from the residence at 2440 South Norwood (1Tr. at 10–11).[1] Detective Sweeney sent Officer Smith to the residence (1Tr. at 11). Officer Smith confirmed that there was indeed a strong odor emitting from that residence (1Tr. at 11). Detective Sweeney requested assistance from Detective Seever and told Seever that several similar complaints had been received in the past (1Tr. at 11–12). Officer Smith told Detective Seever that the odor coming from the residence was a very strong ammonia smell (1Tr. at 12).

2. Detectives Sweeney and Seever drove to South Norwood arriving at approximately 4:25 a.m., parked down the street from the residence in question, and began walking down the street toward the house (1Tr. at 12–13). The house at 2440 South Norwood was located in a residential area (1Tr. at 71). There was a wooden fence separating the residences at 2444 South Norwood and 2440 South Norwood (1Tr. at 13). A woman and her daughter lived in the house at 2444 South Norwood, and there was another house or a duplex on the other side of 2440 South Norwood (1Tr. at 71). When the detectives walked past the wooden fence to the portion of the street in front of 2440 South Norwood, they noticed a strong chemical odor (1Tr. at 13, 15; D.Ex. 4). The odor was not a common one and was one that Detective Seever recognized as being associated with a methamphetamine laboratory (2Tr. at 10).[2]

3. A black Monte Carlo was parked in the front lawn and a man was standing by the tree in the front yard (1Tr. at 14–15; D.Ex. 4). There was a pile of personal items such as duffle bags lying on the ground near the car, and the detectives observed the man either taking the items out of the car or putting them inside the car (1Tr. at 15).

4. As the detectives walked across the yard toward the man, they noticed the chemical smell getting stronger (1Tr. at 15, 45). Detective Seever noticed that the ground level of the house was completely dark, but there were lights shining through the basement windows (1Tr. at 16, 18). Detective Sweeney approached the man in the yard, later identified as Steven Barnes, while Detective Seever walked toward the house in case someone inside decided to come out to the yard (1Tr. at 16, 45; 2Tr. at 9). When Detective Seever approached the front porch, he was able to see into the adjacent basement window (1Tr. at 16, 17–18; P.Ex. 2C). He observed a blue metal can which he recognized to be acetone, some glassware con-

---

1. "1Tr." refers to the transcript of the suppression hearing held on June 24, 1996.

2. "2Tr." refers to the transcript of the detention hearing held on April 12, 1996.

taining a white residue, and some liquids, all sitting on top of a table (1Tr. at 16).

5. Based on his experience, the items he saw and the chemical smell coming from the house, Detective Seever believed there was a methamphetamine lab in the house (1Tr. at 19). Detective Seever relayed this information to Detective Sweeney, and they decided to conduct a "knock and talk" (1Tr. at 19). Detective Sweeney detained the man in the front lawn while Detective Seever and two patrol officers headed toward the basement door (1Tr. at 19). They walked down the driveway on the side of the house (P.Ex. 2H) and headed toward the basement door in the rear of the house (P.Ex. 2I).

6. As Detective Seever and the officers walked along the side of the house toward the back, they noticed that a light in one part of the basement went out (1Tr. at 21, 46, 47). As they rounded the corner of the house toward the back, the smell of ammonia was so strong it hurt Detective Seever's throat, eyes, and nasal passages, and affected his breathing (1Tr. at 22–23). The smell was overwhelming and it was hard for Detective Seever to concentrate (1Tr. at 23).

7. As Detective Seever and the officers approached the back of the house, the basement door opened and two men walked out (1Tr. at 21–22, 23, 46). One of them was defendant (1Tr. at 23). The men stood shoulder to shoulder in the doorway (1Tr. at 23). Detective Seever approached the men with his gun drawn, identified himself as a police officer, and told them he needed to know if there was a fire hazard here due to the overwhelming chemical odor (1Tr. at 23–24, 28, 48, 49).

8. At that time, Detective Seever noticed that he was standing in some kind of liquid (1Tr. at 23). He was also able to see into the house behind the men and observed glassware and other components which he knew to be the sort used in a methamphetamine lab (1Tr. at 24). He identified a bottle of Heet on the coffee table, and on the breakfast bar were gloves and glassware with white residue all over the place (1Tr. at 24–25; P.Ex. 2D; P.Ex. 2G). The entire basement was so packed with glasses, bowls and canisters that there was no flat surface not covered (1Tr. at 26). Detective Seever also observed several individuals inside the residence—some were sitting and some were fleeing to the back of the basement (1Tr. at 24, 49).

9. Detective Seever suspected that the objects on the coffee table and breakfast bar were part of a lab used to manufacture methamphetamine. He knew that Heet (the substance added to gasoline in cars during the winter) is methanol, a component used to manufacture methamphetamine (1Tr. at 25–26; 2Tr. at 12). He knew that methamphetamine and ephedrine, an ingredient used in the manufacture of methamphetamine, are very sticky and the powder sticks to glassware (1Tr. at 24). The glassware Detective Seever observed in defendant's residence was covered with white powder residue (1Tr. at 24–25). Detective Seever also knew through training that many of the chemicals used in the manufacture of methamphetamine are highly flammable and can flare up very quickly and very violently (1Tr. at 9). He also knew that methamphetamine labs are extremely dangerous and can result in explosions (1Tr. at 10).

10. Detective Seever became concerned about what kind of chemical he was standing in, and he was also very concerned about an explosion resulting from the overwhelming amount of chemical fumes concentrated in that small area (1Tr. at 28). He told defendant and the other man that he was going to clear the residence (1Tr. at 28).

11. The two men walked into the residence with Detective Seever and the patrol officers (1Tr. at 28). Detective Seever immediately told all of the occupants in the room to put their hands on their heads, then he made his way down the hallway where other people had fled (1Tr. at 28, 49). The house was so cluttered that people were falling over things (1Tr. at 29). Detective Seever found one person hiding behind a mattress and two others hiding in another room (1Tr. at 29). Those three people were brought back into the main room of the basement where defendant and the others were waiting (1Tr. at 29). One of the individuals had a gun in his possession (1Tr. at 48, 51).

12. While Detective Seever was rounding up the persons who had fled the main room, he observed numerous jars, jugs and glasses which contained chemicals (1Tr. at 29). The substance in the containers consisted of layers with a green layer on top (1Tr. at 30). Those containers were in every room of the basement (1Tr. at 29). Detective Seever knew through his prior training that Coleman fuel is commonly used in manufacturing methamphetamine and creates a green layer on top of a layer of methamphetamine (1Tr. at 30).

13. After all of the occupants were in one room of the residence, Detective Seever asked who owned or rented the residence (1Tr. at 30). Detective Seever asked the question in order to find out which person would know if there was any possible heat source which would increase the risk of an explosion (1Tr. at 30). Defendant stated that he was the owner of the residence (1Tr. at 31). Detective Seever asked defendant if anything was burning, such as a water heater with a pilot light, a Bunsen burner or a hot plate, or anything cooking in the kitchen (1Tr. at 31). Defendant said no (1Tr. at 31).

14. Sometime during the beginning of this incident, one of the officers radioed into the police station a report of what was happening and also called the fire department (1Tr. at 31–32, 33). Other officers showed up and assisted Detective Seever in removing the occupants from the house (1Tr. at 32). While the occupants were being removed, Detective Seever quickly went through the basement level of the house to make sure there were no heat sources operating (1Tr. at 32, 34). Detective Seever was not at that time looking for any evidence of drug activity although the entire house was full of it (1Tr. at 32).

15. From the time Detective Seever entered the house until the time the occupants were removed, approximately five minutes elapsed (1Tr. at 62).

16. A captain from the fire department was advised of the hazardous nature of what was observed in the house (1Tr. at 33). The fire captain walked through the house then told Detective Seever that he had observed a fan operating, but he considered the danger of unplugging the fan, which could produce a spark, greater than leaving it running (1Tr. at 33–34; 2Tr. at 15). Then he and members of the Independence Haz–Mat team put yellow fire tape all around the property of the residence (1Tr. at 33–34; 2Tr. at 15).

17. Detective Seever placed defendant in the police vehicle for transport to the police station (1Tr. at 34–35). After Seever buckled defendant in then sat down in his own seat, defendant told Detective Seever that if the police had just been a little later he would have been in Corpus Christi, Texas; and that if his friends had been quicker in dumping the chemicals outside, everything would have been cleaned up and he would not have gotten caught (1Tr. at 35–36, 54). Neither Detective Seever nor Detective Sweeney, who was also present, had asked defendant any questions to prompt this comment (1Tr. at 35–36).

18. At this point, Detective Seever remembered the chemical he had stepped in outside the basement of defendant's house (1Tr. at 36). He was aware that in the past, agents had tracked chemicals from clean-ups into their cars, their homes, and police stations (1Tr. at 36). Detective Seever was concerned about contaminating anything which might come in contact with his family members or persons at the police station (1Tr. at 36). Detective Seever asked defendant what chemical Seever had been standing in at the back door of the residence (1Tr. at 36, 38–39). Defendant stated that it was only acetone (1Tr. at 36).

19. Defendant then explained that he and the others had been pouring all the chemicals in the back yard because if they pour them inside the residence, the fumes can come up from the toilet or the sewer drain since Coleman fuel is denser than air, and it can get into light sockets or pilot lights resulting in an explosion or fire (1Tr. at 37). Detective Seever told defendant that they would talk about that when they got to the police station (1Tr. at 38). He told defendant that it was obvious he wanted to be cooperative, but it was a common police practice to wait to conduct an interview until the parties were in a room with a desk and had something to

write on (1Tr. at 38). In order to change the conversation for the ten-minute drive to the police station, Detective Seever began talking about the boxer and pups he had observed at defendant's residence (1Tr. at 38).

20. Once they arrived at the Independence, Missouri, police station, Detective Seever, Detective Sweeney and defendant went to an interview room (1Tr. at 39). The handcuffs were removed from defendant who was being very cooperative (1Tr. at 39). Detective Seever read defendant his *Miranda* rights, and defendant said he would waive his rights and that he had "already admitted it" (1Tr. at 39–41; P.Ex. 3A).

21. Detective Seever then began asking defendant questions (1Tr. at 41). As he asked questions, Detective Seever wrote the questions down and then wrote down defendant's answers (1Tr. at 41). At the end of the interview, Detective Seever explained how he had written down the questions and answers, then gave the sheets of paper to defendant to review (1Tr. at 41). After defendant made a few changes, he signed his name at the bottom and the detectives signed their names as well (1Tr. at 41; P.Ex. 3B). The interview lasted approximately one hour (1Tr. at 42).

22. After completing the interview with defendant, Detectives Seever and Sweeney prepared the affidavit/application for a warrant to search 2440 South Norwood and drove to Judge Robert Trout's residence (1Tr. at 43; P.Ex. 1A). Judge Trout issued a search warrant (1Tr. at 43; P.Ex. 1B).

23. Detectives Seever and Sweeney then returned to 2440 South Norwood where the Independence Haz–Mat team and DEA agents were there waiting for the warrant (1Tr. at 44). There was no one inside the house and the yellow fire tape was still around the house (1Tr. at 44–45). DEA agents removed the chemicals from the basement (1Tr. at 45). Members of the police department conducted brief searches of the upstairs because they could not stay in the house for very long due to the fumes (2Tr. at 16).

24. The DEA agents removed large jars of chemicals including acetone, Coleman fuel, Red Devil lye, large amounts of ephedrine and methamphetamine (2Tr. at 17). Two loaded guns were also found in the basement (2Tr. at 17). It was estimated by a DEA chemist at the scene that approximately 30 pounds of methamphetamine could have been manufactured with the chemicals found in defendant's residence (2Tr. at 18).[3]

25. John Lawson, a private investigator, testified at the hearing that he was unable to see inside the basement through the window that Detective Seever looked through on March 9, 1996. I find that this testimony does not contradict that of Detective Seever since (1) Mr. Lawson attempted to look through the window during the day when it was light outside and dark in the basement, while Detective Seever looked through the window during the night when it was dark outside and there were lights on in the basement; and (2) Mr. Lawson attempted to look through the window more than a month after Detective Seever was there.

### III. STATEMENT OF OCCUPYING THE HOUSE

After Detective Seever rounded up all of the occupants, he asked who owned or rented the house. Defendant stated that he was the owner of the residence. Detective Seever then asked defendant if anything was burning, such as a water heater with a pilot light, a Bunsen burner or a hot plate, or if anything was cooking in the kitchen; and defendant said there was not. Defendant now challenges these statements on the ground that he was in custody when questioned but was not advised of his *Miranda* rights.

The fifth amendment guarantees that no person shall be compelled in any criminal case to be a witness against himself or herself. However, the fifth amendment itself does not prohibit all incriminating admissions. "Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning ad-

---

**3.** During questioning by Detective Seever, defendant stated that he made $1,800 per ounce selling methamphetamine (P.Ex. 3B).

missions." *United States v. Washington,* 431 U.S. 181, 187, 97 S.Ct. 1814, 1818, 52 L.Ed.2d 238 (1977). In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court presumed that custodial interrogation is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to waive those rights. The prophylactic *Miranda* warnings are "not themselves rights protected by the Constitution, but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." *Michigan v. Tucker,* 417 U.S. 433, 444, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182 (1974).

Later in *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), the Supreme Court carved out a limited exception to the rule enunciated in *Miranda v. Arizona.* In that case, the Court held that:

> [T]here is a "public safety" exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence, and ... the availability of that exception does not depend upon the motivation of the individual officers involved.

*New York v. Quarles,* 467 U.S. at 655–56, 104 S.Ct. at 2631. The Court concluded that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the fifth amendment's privilege against self-incrimination. *Id.* at 657, 104 S.Ct. at 2632. The exception applies not only to protect the public safety but also police safety. *Id.* at 656, 104 S.Ct. at 2631–32.

■ In this case, Detective Seever asked who owned the residence and whether anything was burning in order to find out which person would know if there was any possible heat source which would increase the risk of an explosion. As in *New York v. Quarles,* Detective Seever asked only the questions necessary to secure the safety of himself, the other officers, and the occupants of the house. *See New York v. Quarles,* 467 U.S. at 658–59, 104 S.Ct. at 2632–33. The questions were not "designed solely to elicit testimonial evidence" from defendant. *Id.*

My review of the cases involving the public safety exception reveals that for the most part this exception has been reserved for statements relating to the location of missing guns. However, I have been unable to find a case wherein the issue was whether the threat of an explosion from a methamphetamine lab constitutes a danger to the public sufficient to trigger the public safety exception announced in *New York v. Quarles.* For the following reasons, I find that it does.

## A. CONSTITUTIONAL RIGHT VERSUS PROPHYLACTIC RULE

The fourth amendment to the United States constitution guarantees the right against unreasonable searches and seizures and outlines the requirements for a valid search warrant. Warrantless searches and seizures inside a home are presumptively unreasonable. *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). Therefore, police officers may not enter or search a home without a warrant unless justified by exigent circumstances. *Payton v. New York,* 445 U.S. at 589, 100 S.Ct. at 1381–82. Exigent circumstances exist when police officers have a legitimate concern for the safety of themselves or others. *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1949–50, 56 L.Ed.2d 486 (1978); *United States v. Vance,* 53 F.3d 220, 222 (8th Cir.1995). Several courts have held that the danger of fire or explosions from chemicals found in drug labs justifies a warrantless entry into a home. *United States v. Boettger,* 71 F.3d 1410 (8th Cir.1995); *United States v. Callabrass,* 607 F.2d 559 (2nd Cir. 1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980); *United States v. Clark,* 617 F.Supp. 693 (E.D.Pa.1985), *aff'd,* 791 F.2d 922 (3rd Cir.1986).

Based on the discussions in the above-cited cases, it is reasonable to conclude that the imminent danger of an explosion is a sufficient threat to the public safety to justify the public safety exception enunciated in *New York v. Quarles.* Certainly a threat to public safety sufficient to justify a warrantless search of a home, which involves a constitutional right, is sufficient to invoke the public safety exception to the prophylactic *Miranda*

warnings, which does not involve a constitutional right.

## B. DEGREE AND IMMEDIACY OF DANGER

In *New York v. Quarles,* police were told by a rape victim that her attacker had just entered a grocery store and had a gun. The police entered the store and Quarles, who matched the description of the rapist, ran from police. Police caught him in possession of an empty shoulder holster. One of the officers asked Quarles where the gun was, and Quarles responded. That statement was the subject of the Supreme Court's new public safety exception to the *Miranda* warnings. The Court's concern was that "an accomplice might make use of it, [or] a customer or employee might later come upon it." *New York v. Quarles,* 467 U.S. at 657, 104 S.Ct. at 2632.

In this case, the chemical fumes emitting from the residence were so strong that Detective Seever's throat, eyes, and nasal passages burned. The fumes affected his breathing, and the smell was so overwhelming it was hard for him to concentrate. Detective Seever knew that many of the chemicals used in the manufacture of methamphetamine are highly flammable, can flare up very quickly and very violently, and can result in explosions. The chemicals used in methamphetamine labs can get into light sockets or pilot lights resulting in an explosion or fire. The danger of an explosion—which could have injured or killed the officers, the occupants of the house, and the occupants of the adjacent homes—was certainly as great as the danger that an accomplice, customer or employee would come across the gun which had been discarded in *Quarles.* In addition, because the smallest spark (such as that caused by unplugging an electric fan) or even a light socket can cause an explosion, the danger in this case was even more imminent than that in *Quarles.*

## C. TYPE OF DANGER CONTEMPLATED BY NEW YORK v. QUARLES

The Supreme Court described the situation in *Quarles* as "a kaleidoscopic situation ...

where spontaneity rather than adherence to a police manual is necessarily the order of the day". *New York v. Quarles,* 467 U.S. at 656, 104 S.Ct. at 2631. The Court stated that:

> The exception will not be difficult for police officers to apply because in each case it will be circumscribed by the exigency which justifies it. We think police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect.

*Id.* at 658–59, 104 S.Ct. at 2633. Indeed, in *Quarles* the Court found that the officer "needed an answer to his question not simply to make his case against Quarles but to insure that further danger to the public did not result". *Id.* at 657, 104 S.Ct. at 2632.

In this case, Detective Seever was faced with an overwhelming amount of chemical fumes concentrated in a small area. Before he asked any questions, Detective Seever saw several individuals in the house—some were running to other parts of the basement and some remained in the main room. He recognized the ingredients of a methamphetamine lab and could see that the house was so full of evidence of manufacturing methamphetamine that there was no flat surface not covered. The danger of an explosion was obvious. Detective Seever instinctively asked only the questions necessary to ensure his safety and the safety of the many individuals in the vicinity.

I find that this is precisely the kind of danger to public safety that was contemplated by the Court in *New York v. Quarles.* Therefore, because the questions about the ownership of the house and whether there were any heat sources operating fall within the public safety exception to the *Miranda* requirement, defendant's motion to suppress those statements should be denied.

## IV. STATEMENT OF INTENT TO GO TO CORPUS CHRISTI

After Detective Seever placed defendant in the police vehicle for transport to the police station and got into the car himself, Detec-

tive Seever was told by defendant that if the police had been a little later defendant would have been in Corpus Christi, Texas; and that if his friends had been quicker in dumping the chemicals outside, everything would have been cleaned up and he would not have gotten caught. Defendant argues that this statement was obtained in violation of his constitutional rights since he had not been advised of his *Miranda* rights at that point.

The reading of *Miranda* rights is required whenever a suspect is interrogated while in custody. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). There is no question that defendant was in custody and had not been advised of his *Miranda* rights. Therefore, the issue here is whether defendant was "interrogated."

■ The term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980). *Miranda* has no application to statements that are voluntarily offered and are not a product of either express questioning or its functional equivalent. *Miranda v. Arizona,* 384 U.S. at 478, 86 S.Ct. at 1629–30; *United States v. Cordova,* 990 F.2d 1035, 1038 (8th Cir.), *cert. denied,* 510 U.S. 870, 114 S.Ct. 197, 126 L.Ed.2d 155 (1993); *United States v. Bourgeois,* 746 F.2d 401, 404 (8th Cir.1984). *Accord, United States v. Romero,* 856 F.2d 1020, 1022 (8th Cir.1988), *cert. denied,* 488 U.S. 1016, 109 S.Ct. 811, 102 L.Ed.2d 800 (1989); *United States v. McGauley,* 786 F.2d 888, 891 (8th Cir.1986).

■ In this case, neither Detective Seever nor Detective Sweeney (both of whom were in the car with defendant) had asked defendant any questions to prompt defendant's comment. There is no evidence that either detective said anything, and there is no evidence that either detective did anything which could be characterized as the functional equivalent of questioning. Therefore, because defendant's comments about Corpus Christi and dumping the chemicals were statements volunteered by defendant, *Miranda* is not applicable and defendant's motion to suppress these statements should be denied.

## V. STATEMENT OF CHEMICAL OUTSIDE BASEMENT DOOR

■ After defendant's spontaneous statement that if his friends had been quicker in dumping the chemicals outside, everything would have been cleaned up and he would not have gotten caught, Detective Seever remembered the chemical he had stood in outside the basement door of defendant's house. He then asked defendant, who was in custody and had not been advised of his *Miranda* rights, what the chemical was. Defendant stated that it was only acetone. He went on to explain that he and the others had been pouring all the chemicals in the back yard because if the chemicals are poured inside the residence, the fumes can come up from the toilet or the sewer and can get into light sockets or pilot lights resulting in an explosion or fire.

I find that these statements fall within the public safety exception to the *Miranda* requirement. As discussed in Section III. above, Detective Seever instinctively asked only the question necessary to ensure his safety and the safety of his family members and persons at the police station. He was aware that in the past, agents had tracked chemicals from clean-ups into their cars, their homes, and police stations. After defendant identified the chemical in response to Detective Seever's question, he went on to explain why the chemicals were dumped in the backyard as opposed to the house. Detective Seever stopped defendant and stated that it was common practice to wait until the parties were at the police station to conduct an interview.

Therefore, because this statement falls within the public safety exception to the *Miranda* requirement, defendant's motion to suppress these statements should be denied.

## VI. STATEMENT GIVEN AT POLICE STATION

Finally, defendant argues that the statements given at the police station following

*Miranda* warnings should be suppressed as fruits of the earlier "unlawful admissions." Defendant does not argue that his statement was involuntary or that he did not make a knowing and voluntary waiver of his *Miranda* rights.

Because I find that the earlier statements were not unlawful admissions, the statement made at the police station is not a fruit of any unlawful act. The evidence clearly indicates that defendant was advised of his rights, he knowingly and voluntarily waived those rights, he was very cooperative, and he made a voluntary statement to police. Therefore, defendant's motion to suppress these statements should be denied.

### VII. CONCLUSION

Based on the above-stated findings of fact and the law as discussed in sections III through VI, I make the following conclusions of law:

1. The statement made following Detective Seever's question about the ownership of the house and whether any heat sources were operating falls within the public safety exception to the *Miranda* requirement.

2. Defendant's comments about going to Corpus Christi and dumping the chemicals were statements volunteered by defendant.

3. Defendant's statement in response to Detective Seever's question regarding the identity of the chemical Seever stepped in falls within the public safety exception to the *Miranda* requirement.

4. Defendant's statement given at the police station was voluntarily made after knowingly and voluntarily waiving his *Miranda* rights and was not a fruit of an earlier unlawful admission.

Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress statements.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of receipt of a copy of this report and recommendation to file and serve specific objections unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.